IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| Stacy W. Pringle, #141320 ) | C/A No. 5:15-01571-JFA-KDW |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | |
| ) | REPORT AND RECOMMENDATION |
| ) | |
| Joseph McFadden, Warden, ) | |
| ) | |
| Respondent. ) | |
| _____ ) | |

Petitioner Stacy W. Pringle ("Petitioner") is a state prisoner who filed this pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter is before the court pursuant to 28 U.S.C. § 636(b)(1)(B), and Local Civil Rule 73.02(B)(2)(c) DSC, for a Report and Recommendation on Respondent's Return and Motion for Summary Judgment. ECF Nos. 23, 24. On September 9, 2015, pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the court advised Petitioner of the Summary Judgment Motion, dismissal procedures, and the possible consequences if he failed to respond adequately to Respondent's Motion. ECF No. 25. On January 19, 2016, Petitioner filed a Response in Opposition to Respondent's Motion for Summary Judgment. ECF No. 38.[1] Having carefully considered the parties' submissions and the

---

[1] On the same date Petitioner filed a Motion for an evidentiary hearing. ECF No. 37. Pursuant to 28 U.S.C.A. § 2254(e)(2)(A) the court shall not hold an evidentiary hearing unless the Petitioner shows that: "(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." Petitioner has not shown that an evidentiary hearing is warranted, and therefore his Motion, ECF No. 37, **is denied**.

record in this case, the undersigned recommends that Respondent's Motion for Summary Judgment, ECF No. 23, **be granted**.

I.    Background

Petitioner is currently incarcerated in the Lieber Correctional Institution ("LCI") of South Carolina Department of Corrections ("SCDC"). ECF No. 1 at 1. In 2003, Petitioner was indicted at the April term of the Sumter County Grand Jury for kidnapping (three counts), assault and battery with intent to kill ("ABWIK"), assault with intent to kill ("AWIK"), murder, and possession of a firearm during the commission of a crime of violence (2003-GS-43-392). App. 496-97.[2] Attorney Steven S. McKenzie represented Petitioner in a jury trial that convened from August 2-4, 2004, and Assistant Solicitor Harry C. Connor represented the State. App. 3. Petitioner was tried before the Honorable Howard P. King. *Id.* After the trial, the jury found Petitioner guilty of all charges. App. 481-82. Judge King sentenced Petitioner to life imprisonment for the murder conviction, 30-years imprisonment for each kidnapping conviction, 20-years imprisonment for ABWIK, 10-years imprisonment for AWIK, and five-years imprisonment for the possession of a firearm conviction. App. 493-94.

Assistant Appellate Defender Robert M. Dudek represented Petitioner on appeal and briefed the following issue pursuant to *Anders v. California*, 386 U.S. 738 (1967): "Whether the court erred by refusing to grant a mistrial where the decedent's mother had an emotional outburst, and had to be helped from the courtroom, since there was also graphic evidence that at least one juror was visibly moved by the outburst?" App. 502. Petitioner also filed a pro se Response to the *Anders* brief with the Court of Appeals and raised the following two issues:

---

[2] Citations to "App." refer to the Appendix for Petitioner's trial transcript, appeal from his sentence and conviction, and his claim for collateral relief in the state courts of South Carolina. That Appendix is available at ECF Nos. 24-1 through 24-6 in this habeas matter.

> (1) Did the trial judge err by granting the state permission to impeach the Defendant based upon a "similar" prior conviction without evaluating the probative vs. prejudicial value within the circumstances unique to the case at trial?
>
> (2) Did the trial judge err by denying the defense's motion for a continuance? (and did) such a denial effectively remove the applicant's Sixth Amendment guarantee of "effective assistance of counsel,"? (and was) the Applicant further prejudiced by the court's failure to place on-the-record the specific reasons for denying that motion?

App. 509.

On January 17, 2007, the South Carolina Court of Appeals dismissed Petitioner's appeal and granted Attorney Dudek's motion to be relieved as counsel, App. 528-29, and on February 2, 2007, the South Carolina Court of Appeals issued a Remittitur. ECF No. 24-7.

## II.     Procedural History

Petitioner filed an application for Post-Conviction Relief ("PCR") on February 26, 2007 (2007-CP-43-426). App. 530-35. Petitioner asserted the following allegations, recited verbatim, regarding his claims:

> a) Ineffective assistant counseling.
> b) A thorough investigation wasn't done on behalf of my lawyer and law enforcement officers/detectives.

App. 531. On October 15, 2010, Attorney Tricia A. Blanchette file an Amendment to Petitioner's PCR Application on Petitioner's behalf, App. 537-39, and outlined 12 ways his trial counsel was ineffective in failing to investigate, and outlined 10 ways his trial counsel was ineffective during his criminal trial. A Return was filed on behalf of the State on June 13, 2007. App. 541-43. A PCR hearing convened on October 29, 2010, before the Honorable W. Jeffrey Young. App. 544-717. Petitioner was present and represented by Attorney Blanchette; Mary S. Williams, Esq. appeared on behalf of the State. *Id.* Dorothy Perry, Ricky Lee Wright, and Sammy Wells testified as witnesses during Petitioner's PCR hearing but were not called to testify during

3

Petitioner's criminal trial. 549-572. Additionally, Petitioner, private investigator Peter Skidmore, and trial counsel McKenzie testified during the hearing. App. 572-716. After both parties submitted briefs, in an Order filed November 30, 2010, the PCR court denied Petitioner's PCR Application in full, making the following findings of fact and conclusions of law:

> In his application his original application for post-conviction relief (PCR), Applicant alleges that he is being held in custody unlawfully for the following reasons:
>
> 1.  Ineffective assistance of trial counsel.
>     a.  "A thorough investigation wasn't done on behalf of my lawyer and law enforcement officers/detectives."
>     b.  "Lawyer didn't properly represented (sic) at trial."
>     c.  "Evidence and ballistics wasn't (sic) handled properly and my witnesses (sic) wasn't subpoena (sic) to court."
>
> In an amended application dated October 14, 2010, Applicant set forth the following grounds for relief:
>
> 1.  Ineffective assistance of trial counsel, specifically but not limited to the following grounds:
>     a.  Failure to prepare and investigate, specifically but not limited to the following:
>         i.    Failure to provide full discovery to the Applicant and review it with him prior to trial.
>         ii.   Failure to review and/or investigate the autopsy report and the medical discharge report of the victim.
>         iii.  Failure to review and/or investigate the incident report, specifically, the reports of Officer Rach and Sergeant Williams.
>         iv.   Failure to review and/or investigate the witness statements provided by the State.
>         v.    Failure to obtain and/or investigate Detective Nesbitt's report.
>         vi.   Failure to obtain, review, and/or investigate the full SLED file and its contents.
>         vii.  Failure to utilize a private investigator or conduct an independent investigation. Specially, failure to locate and interview potential defense witnesses.
>         viii. Failure to obtain a preliminary hearing transcript.
>         ix.   Failure to prepare a third party guilt or self-defense claim.
>         x.    Failure to review the indictment with the Applicant and address any irregularities.

xi.     Failure to discuss the Life Without Parole Notice with the Applicant.

xii.    Failure to discuss the potential of the Applicant testifying on his own behalf.

b.  Ineffective Assistance of Counsel during trial, specifically but not limited to the following.

i.      Failure to advise the Applicant about pre-trial stipulations made with the Solicitor's Office.

ii.     Failure to address indictment issues prior to trial.

iii.    Failure to prepare the Applicant for the <u>Jackson v. Denno</u> hearing or call the Applicant as a witness during it.

iv.     Failure to properly raise third party guilt.

v.      Failure to properly cross examine witnesses and use the witness statements to the benefit of the defense.

vi.     Failure to address or attempt to admit the drugs found on the victim as part of the Applicant's defense.

vii.    Failure to properly address the ballistics evidence and the information contained in the SLED file.

viii.   Failure to call any witnesses on the Applicant's behalf or put up a defense.

ix.     Failure to establish self-defense prior to making a request for a self-defense charge.

x.      Failure to request a mere presence instruction.

c.  Ineffective Assistance of Appellate Counsel: Failed to address meritorious issues preserved for appeal.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This Court has had the opportunity to review the record in its entirety and has heard the testimony at the post-conviction relief hearing. This Court has further had the opportunity to observe the witnesses presented at the hearing, closely pass upon their credibility and weigh their testimony accordingly. Set forth below are the relevant findings of facts and conclusions of law as required pursuant to S.C. Code Ann. § 17-27-80.

### Ineffective Assistance of Counsel

The Applicant alleges he received ineffective assistance of counsel. In a PCR action, "[t]he burden of proof is on the applicant to prove his allegations by a preponderance of the evidence." <u>Fraiser v. State</u>, 351 S.C. 385, 389, 570 S.E.2d 172, 174 (2002) (citing Rule 71.1(e), SCRCP). Where ineffective assistance of counsel is alleged as a ground for relief, the Applicant must prove that "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result." <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 692 (1984); <u>Butler v. State</u>, 286 S.C. 441, 334 S.E.2d 813 (1985).

The proper measure of performance is whether the attorney provided representation within the range of competence required in criminal cases. Courts presume that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. Butler, Id. The Applicant must overcome this presumption to receive relief. Cherry v. State, 300 S.C. 115, 386 S.E.2d 624 (1989).

First, the Applicant must prove that counsel's performance was deficient. Under this prong, attorney performance is measured by its "reasonableness under professional norms." Cherry, 300 S.C. at 117, 385 S.E.2d at 625 (citing Strickland, supra). Second, counsel's deficient performance must have prejudiced the Applicant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Cherry, 300 S.C. at 117-18, 386 S.E.2d at 625. "A reasonable probability is a probability sufficient to undermine confidence in the outcome of trial." Johnson v. State, 325 S.C. 185, 186, 480 S.E.2d 733, 735 (1997) (citing Strickland).

*Summary of Facts Adduced at Trial*

James Bratton ("Bratton") was killed as a result of gunshot wounds at KJ's Lounge in the early morning hours of September 21, 2002. Another club patron, Julie Ealey ("Ealey"), also suffered a non-fatal gunshot wound just above her sternum, apparently from a stray bullet.

According to four witnesses inside the club, Bratton was dancing on the dance floor when Applicant approached and shot him at close range. All witnesses at trial who knew Bratton stated that Bratton was unarmed. Club proprietor Kelvin Perry and security employee Robert Tisdale ("Tisdale") saw Applicant leaving the club with a gun in his hand immediately after the shooting. Witnesses reported that Applicant had blood on his shirt.

Alicia Rhodes ("Rhodes") had been inside the club when the shooting occurred and ran outside. According to Rhodes, she encountered Applicant outside. Rhodes testified that Applicant pointed the gun at her, but when he pulled the trigger the gun did not go off. Terrance Blanding ("Blanding") witnessed the incident between Applicant and Rhodes. Applicant then approached a vehicle occupied by Willie Peeples ("Peeples"), Gregory Canty ("Canty"), and Kevin Young ("Young"). According to Peeples, Applicant pointed the gun at one of the passengers and told them to drive off. Young confirmed that Applicant told them to drive away at gunpoint. Sheila McCray ("McCray"), Young's girlfriend, followed them in her vehicle. Peeples and Young heard Applicant say he killed someone.

Four casings collected inside the club were fired by the same 9mm weapon. A damaged bullet jacket was believed to have been fired from a 9mm or .380 High

Point firearm. Gunshot residue was found on Bratton's left palm and the back of his right hand. Ricky Jones, another club patron, was initially searched for a weapon when law enforcement arrived but found not to have a weapon. Written statements of several witnesses were taken.

*Failure to Investigate*

Applicant asserts that Counsel was ineffective for failing to adequately investigate. Applicant points to several individuals whom he believes Counsel should have located during a reasonable investigation and called as witnesses at trial.

Counsel testified regarding his investigation and preparation generally. Counsel stated emphatically that he reviewed discovery materials with Applicant. Counsel testified that he met with Applicant often, more than any other client he had. Counsel took notes at meetings with Applicant, and he had several names of individuals Applicant asked him to investigate. Counsel also reviewed police reports for names of other possible shooters. Counsel stated that he personally visited several homes, knocked on doors, and left his card in the course of trying to locate witnesses. Counsel also met with at least one witness, Wright, at Applicant's mother's house. Counsel visited the outside of the club and took photographs. Counsel also discussed witness Terrance Epperson ("Epperson"). Based on Counsel's discussions with Epperson, Counsel believed that Epperson would appear for trial and provide some testimony beneficial to the defense. Counsel provided Applicant and Applicant's mother with his cell phone number so that they could communicate.

I find Counsel's investigation was within reasonable professional norms. I find Counsel's testimony regarding his investigation to be credible. Counsel conducted an independent investigation, following up on leads provided by his client and meeting with potential witnesses. Individual allegations regarding Counsel's investigation are discussed in detail below.

i. *Dorothy Perry*

Applicant specifically alleges that Counsel failed to investigate and call Perry as a witness at trial. Perry's husband, Kelvin Perry, was the owner of KJ's Lounge and testified at trial. Counsel testified that the Perrys would not speak with him, but he had their statements to use in preparation for trial. Combined with the discussion of Counsel's investigation above, I find Counsel's investigation in this aspect reasonable.

At PCR hearing, Perry affirmed her statements to law enforcement (Applicant's #5). Perry did not recall giving any information about someone else in the club having a gun. Perry denied that she knew Ricky Jones and denied giving any information that Ricky Jones had a weapon. Perry's statement makes no mention

of anyone else having a gun. Perry stated that the interior of KJ's had ample light to see. Perry stated that her husband would be better able to discuss certain procedures at the establishment (e.g. what time the door closed). Perry stated that a bodyguard usually patted down patrons for weapons. Based on Perry's testimony, I find no prejudice to Applicant such that the outcome of the trial would have been affected. Perry's testimony was largely cumulative to her husband's. Further, Perry's testimony would not have benefited Applicant as she would have been another witness identifying Applicant with a gun and would have supported other witnesses in statement that there was ample light to see.

### ii. Ricky Wright

Applicant further argues that Counsel erred in failing to call Wright as a defense witness. Wright knew Applicant due to Applicant's prior relationship with Wright's sister. Wright stated that he was outside KJ's with his friend Pookie on the evening in question. Wright never went inside the club. Wright saw Applicant leave the club and get into a car and leave with other individuals. Wright did not see a gun. Wright was unsure what kind of car Applicant got into. Wright left the scene before emergency personnel arrived. Wright stated that he had been convicted for drug-related offenses in the past.

Counsel stated that he met with Wright at Applicant's mother's house. Counsel opined that Wright's testimony would not be especially helpful. Counsel felt that Wright's testimony was not strong enough to justify losing last closing argument. Therefore, Counsel did not call Wright as a defense witness. Upon observing the witness and considering Counsel's explanation of his decision not to call Wright, I find Counsel's explanation reasonable under professional norms. See for example Whitehead v. State, 308 S.C. 119, 417 S.E.2d 530 (1992) (where counsel articulates a valid reason for employing certain strategy, such conduct will not be deemed ineffective assistance of counsel). I further find that had Counsel called Wright as a witness, the outcome of the trial would not likely have been different. Given the several witnesses both inside and outside the club who identified Applicant with a firearm, Wright's testimony from his vantage point outside the club that he did not see a weapon would not likely affect the outcome of trial.

### iii. Sammy Wells

Applicant further asserts that Counsel's failure to locate, interview, and call Sammy Wells ("Wells") as a trial witness constitutes ineffective assistance of counsel.

Wells testified at PCR hearing that he does not really know Applicant but cuts Applicant's son's hair. Wells testified that he was at KJ's Lounge on the night in question. Wells stated that he was on the back porch smoking cigarettes. At some point he was near the back door and saw Bratton shooting a gun. Wells did not see who Bratton was shooting at. Wells recalled stepping over a girl who had

been shot on his way out of the club. Wells stated that he left KJ's Lounge before emergency personnel arrived. Wells affirmed that he had never talked to anyone about what he had seen and had not contacted the police at any time. Wells has a criminal record which includes convictions of Assault and Battery of a High and Aggravated Nature, Resisting Arrest, Burglary –Third Degree, and Strong Arm Robbery.

Counsel stated that he would have liked to have known of Wells at the time of the trial. Counsel reviewed his notes from meetings with Applicant and affirmed that Wells' name did not appear in any of his notes. Counsel did not recall ever hearing of Wells. None of the police reports or witness statements presented mentioned Wells.

A criminal defense attorney has a duty to conduct a reasonable investigation. As previously noted, Counsel's investigation was within reasonable professional norms. I further find that Counsel's failure to locate Wells under the particular circumstances of this case was not unreasonable. Counsel conducted not only a thorough review of the State's evidence in the case but also engaged in an independent investigation based on the evidence and information from his client. Counsel has no reasonable means to know of Wells. Wells was not at the scene when law enforcement arrived and no witness statement makes mention of Wells. There is no evidence that any other potential witnesses (e.g. Wright or even Applicant) mentioned Wells. Wells, by his own admission, never told anyone at all about what he claimed to have seen prior to the PCR stage. No evidence was provided as to how Wells was located for PCR hearing. Under these circumstances, I find that Counsel's inability to locate Wells is not indicative a constitutionally deficient investigation.

Even if Counsel's investigation were deemed deficient, I would find that Wells' testimony would not likely affect the outcome of the trial. Four witnesses clearly observed Applicant shoot Bratton. All shell casings at the scene were fired by one weapon. The testimony of Rhodes, Perry, Tisdale, Young, Peeples remains unchallenged by Wells' assertions. Wells' testimony would stand in contrast to several witnesses who averred that Bratton was unarmed. As Counsel articulated at hearing and in a letter to Applicant after trial, the evidence was overwhelming. Wells also lacks credibility. Therefore, I find that even if Counsel could be considered deficient, Applicant has failed to demonstrate prejudice in this regard.

### iv. Other witnesses

Applicant also asserts that Counsel should have located and called Thomas Epperson ("Epperson"), Lachelle Simon ("Simon"), and Canty. None of these witnesses testified at PCR hearing. Skidmore testified as to his efforts to locate Epperson and Simon. Counsel testified that he had spoken with Epperson in preparation for trial. However, at the time of trial Counsel was unable to locate Epperson. Counsel also opined at PCR hearing that Epperson's written statement

may have been used to impeach him and he would have had to consider whether to have Epperson testify. Counsel's investigation was reasonable. Moreover, with regard to each of these witnesses, I find that Applicant has failed to carry his burden of demonstrating prejudice. See for example Moorehead v. State, 329 S.C. 329, 496 S.E.2d 415 (1998) (no prejudice where claim to failure to investigate is supported only by mere speculation as to the result).

### v. Telephone records

Applicant further stated that Counsel should have investigated records from a cell phone turned in to police. Applicant presented the cell phone records and search warrant which were part of his discovery. (Exhibits #14 and 15.) Counsel testified that there was insufficient proof tying the phone to Applicant and that he did not want to pursue something that could place an item of Applicant's property at the scene of the crime. No telephone or telephone record was presented at trial.
Under these circumstances, Counsel was reasonable in this regard. Moreover, Applicant has presented no evidence of any benefit that additional investigation would have yielded.

### vi. Detective Nesbit

Applicant stated that Counsel should have looked into Detective Nesbit's involvement in the investigation because Nesbit had arrested him previously in an unrelated incident. (Applicant's Exhibit #6). Counsel did not recall Applicant expressing any such concern to him during the representation. I find no deficiency by Counsel in this regard. Further, there is no evidence of what benefit additional investigation into this issue would have yielded.

### vii. Firearms and Toxicology Reports

Citing a notation on the SLED report (Applicant's #10-12), Applicant asserts that Counsel should have contacted SLED agents with regard to firearms findings. Applicant also states that Counsel failed to discuss with him the State's position on the admission of cocaine found in Bratton's pocket. (See Tr. p. 303, line 24 – p. 304, line 3; p. 355-356.) I find Counsel's testimony that he reviewed these reports to be credible. He explained that he was prepared to cross-examine the SLED Agents called by the State. In response to the notation in the firearms report, he could not specifically recall if he contacted Agent Parnell. He explained that the issues regarding distance and the wound in the victim's hand were "good for us." He further explained that he thoroughly cross examined the SLED Agents on these issues and felt that he had persuaded the jury. Regarding the toxicology report, Mr. McKenzie recalled that the toxicologist testified regarding the results for the victim and he did not see more that could have been done unless the victim would have tested positive for cocaine. Counsel further explained that he did not attempt to introduce the drug evidence because he did not want to lose the right to last argument. Counsel had also elicited through cross-examination that a white

powder substance had been found on victim. (Tr. p. 303, line 24 – p. 304, line 3.) I find Counsel's explanation in this regard to be reasonable. Moreover, Applicant has failed to demonstrate what additional investigation could have yielded.

### viii. Additional shooters

Applicant points to police reports which initially noted that another individual at the club, Ricky Jones, was reported to be armed. Counsel testified that his efforts to explore other potential shooters were unsuccessful. Counsel did point to Jones as a potential shooter during the trial. (See for example p. 411, lines 16-17; p. 415, line 20 – p. 416, line 17.) I find Counsel's performance not deficient in this regard. Moreover, Applicant has provided no evidence beyond mere speculation as to what additional efforts would have yielded.

### Review of Discovery/Insufficient Cross-Examination

Applicant asserts that Counsel failed to review several items of discovery with him, including the autopsy report, police reports, witness reports, SLED reports, and cell phone records (Applicant's Exhibits #1-15). Applicant also stated that Counsel did not review the LWOP notice with him. Counsel directly contradicted this testimony, stating that he did review discovery materials and the LWOP notice with Applicant. I find Counsel's testimony to be credible and therefore find no deficiency in this regard.

Based on these discovery items, Applicant asserts that Counsel's cross-examination fell short in the following particulars:

- Failed to inquire of Agent Powell about absence of gunshot residue on Applicant's t-shirt.
- Failed to inquire of Agent Powell about the notation that the victim had a "small wound on right palm" and description of victim's hand on form when Powell said he did not know about a wound on the victim's hand. (Tr. p. 332, Applicant's Exhibit #9.)
- Failed to impeach Tammy McDaniel with cell phone records.
- Margaret McDaniel's trial testimony that she stood shoulder to shoulder to Applicant when the shooting occurred was not in her statement. (Tr. p. 89, lines 9-10.) Applicant also asserts that there were inconsistencies regarding his movement in her statement and testimony. He testified that counsel failed to ask if she was tested for gunshot residue or to ask her if the victim carried a gun.
- Applicant testified that Counsel failed to properly cross examine Tammy McDaniel on the details of her testimony, failed to ask her which hand the Applicant allegedly had the gun in and failed to ask her how she did not get blood on her.
- Applicant testified that Counsel failed to ask Mary Johnson which hand she saw the weapon in, how many people were around body when she returned to it, and if she picked up anything from around the victim's body. The Applicant also

11

testified that counsel failed to further question her when she said the club was well lit and he did not ask her about the existence of disco lights. (Tr. p. 139, lines 22-25.) The Applicant further testified that counsel failed to get Johnson to explain what she meant when she testified that the victim was trying to avoid it, and he failed to question her about her testimony that the victim put his hand up, which was not in her statement. (Tr. p. 139, lines 14-16, 137, lines 11-12.)

- Applicant testified that Counsel failed to question Selena McKnight about prior and/or pending charges, and about her statement indicating that she was kind of high. The Applicant also testified that counsel failed to ask her which hand she saw the gun in, and where she was located when the Applicant pulled a gun on Alecia Rhodes.

- Applicant explained that Julie Ealey went into more details regarding everyone's movement in her statement and trial counsel failed to ask her about when the door was locked at the club.

- Applicant testified that Counsel failed to question Rhodes about her testimony that victim was shot at close range and about her claim that the Applicant attempted to shoot her. The Applicant also testified that trial counsel failed to ask her about the report that the Applicant escaped in a dark colored car.

- The Applicant testified that trial counsel failed to question how Peeples heard the shots when he was outside with music playing. The Applicant also testified that counsel failed to utilize inconsistent information contained in his statement and failed to ask him why he did not report the kidnapping of which he was an alleged victim.

- Applicant alleged that trial counsel failed to ask Young about his girlfriend Sheila McCray working at the county jail and why he failed to call the police. The Applicant also pointed out that he testified about a bloody rag, but trial counsel failed to ask him about the fact being omitted from his statement.

- Applicant testified that Counsel did not ask Sheila McCray about delay and/or motive to give a statement. The Applicant also alleged that trial counsel should have asked her if she was checked when she went into the club.

- Applicant explained that had dated the woman that Tisdale married and counsel failed to ask him about it. He also alleged that counsel should have asked him why he did not keep the crowd away from victim's body and if he was related to him.

- Applicant testified that counsel failed to ask Blanding about his location when Rhodes was almost shot and if he was testifying to support his girlfriend. The Applicant also testified that counsel failed to ask him if he or anyone else that was present took a weapon from victim.

- Applicant testified that trial counsel failed to ask Kelvin Perry timing questions, such as when did the Applicant order wings. The Applicant also testified that trial counsel should have asked Mr. Perry about the location of the wall partition, the identity of the disc jockey, the time the back door closed, and prior security issues at the club. The Applicant also explained that he wanted counsel to ask Mr. Perry specific questions about club procedures and prior security issues.

- Applicant asserted that counsel should have asked further questions when Officer Rach testified that he patted down Ricky Jones for a weapon and he was informed that he shooter was still in the club. (Tr. p. 42, 46.)
- Applicant also explained that counsel failed to properly address and cross examine the State's witnesses regarding the ballistics evidence. As to the Applicant's decision to not testify.

Regarding the witness statements and testimony of the State's witnesses, Counsel recalled being prepared to cross examine the State's witnesses since he considered the inconsistencies in the witnesses' stories very important for the defense. He also recalled that the Applicant was actively involved in the questioning the witnesses. Specifically, Counsel stated that he asked the Applicant if there was more to ask of each witness. To highlight inconsistencies, Counsel had each witness place marks on a diagram of the club to demonstrate his or her testimony. Counsel stated that at the end of trial, the diagram had marks in various locations. This visual clearly showed inconsistencies to the jury.

This Court finds that trial counsel thoroughly reviewed the statements of the State's witnesses prior to trial and was prepared to execute his strategy of showing the inconsistencies contained in the witnesses' statements and trial testimony. This Court agrees that there are always additional questions that could be asked during a trial, but this Court finds that the Applicant has failed to show how the failure of counsel to ask additional questions, which the Applicant set forth in his detailed testimony, amounts of ineffective assistance or how he was prejudiced as a result. This Court further finds that the record contains a very detailed and rigorous cross-examination of each witness by trial counsel. Further, Applicant has failed to meet his burden of proving what information would have been obtained had the additional questions been asked and how such information would have changed the result of trial. See for example U.S. v. Rodriguez, 53 F.3d 1439, 1448-1449 (7th Cir. 1995).

*Autopsy Report*

Applicant takes exception to Counsel's agreement to stipulate that the autopsy report would be in evidence at trial. Applicant states that what he perceives as an inconsistency could have been explored in that the autopsy report addresses a wound to Bratton's hand, but the medical report does not. (Applicant's Exhibits # 1 & 2.) It is noted that photos of the wound to Bratton's hand were in evidence at trial.

Counsel testified that he agreed to the admission of the autopsy report because he felt that it would minimize the focus on the dead man. This Court finds counsel's decision to not emphasize the existence of a dead man to be reasonable. This Court further finds that trial counsel effectively addressed the wound in victims hand through cross examination and the use of the autopsy, medical report, or SLED documentation would have been merely cumulative to the picture

13

introduced by counsel. This Court further finds that trial counsel attempted to capitalize on the testimony and evidence regarding distance and gunshot residue to persuade the court to charge the jury on self-defense. Further, it is unclear what additional benefit could have been yielded from live witness testimony regarding the autopsy results.

*Pre-Trial Motions*

Applicant takes issue with Counsel's performance with regard to pre-trial motions. Counsel made no motion or notice pre-trial regarding third party guilt. Counsel explained that the theory of the defense was not a true third party guilt claim, but rather a strategy of establishing enough reasonable doubt in the minds of the jury that "some other [unspecified] dude" could have been the shooter. Therefore, Counsel was not ineffective in this regard. Counsel further stated that he requested a continuance to make further endeavors to locate witnesses (i.e. Epperson), but the motion was denied. This Court further finds that trial counsel was prepared for the <u>Jackson v. Denno</u> hearing and was not ineffective in handling this hearing as was alleged by the Applicant.

*Decision to Testify*

Applicant asserts that Counsel failed to discuss whether or not he should testify at trial. Counsel testified that he felt that Applicant would be a poor witness due to his prior record and demeanor. The record reflects that Applicant was advised by the trial court of his rights to testify. (Tr. pp. 174-177; pp. 383-385.) The record reflects that Applicant's decision not to testify was made freely and voluntarily. Further, Counsel articulated reasonable concerns with presenting Applicant as a witness. Finally, Applicant has failed to offer any evidence of prejudice in this regard. <u>See Jackson v. State</u>, 329 S.C. 345, 495 S.E.2d 768 (1998) (strategic decision not to have defendant testify; no additional evidence to support defense shown).

*Failure to Request Mere Presence Charge*

The Applicant also alleged that trial counsel was ineffective when he failed to request a mere presence charge. Based upon trial counsel's testimony at the evidentiary hearing, this Court finds that trial counsel was not ineffective for failing to request a mere presence instruction since such request would be in contradiction to his request and argument for a self-defense charge. Therefore, this claim also must fail.

*Sex Offender Registration*

Applicant asserts that Counsel failed to ask the sentencing court to make a determination as to whether he was required to register as a sex offender in connection with his convictions for kidnapping. S.C. Code § 23-3-430(c)(15)

provides that a person who has been convicted of, pled guilty or nolo contendere to, or been adjudicated delinquent for kidnapping (section 16-3-910) of a person eighteen years of age or older shall be referred to as an offender *except* when the court makes a finding on the record that the offense did not include a criminal sexual offense or an attempted criminal sexual offense. No such finding was made in the present case. The South Carolina Department of Corrections records reflect that Applicant would currently be required to register as a sex offender.

Based on the facts of the present case, I find the Applicant's three kidnapping convictions should be remanded to the Court of General Sessions solely for the purpose of allowing a finding to be made on the record as to whether or not the kidnappings were sexual in nature.

### Ineffective Assistance of Appellate Counsel

Appellate counsel submitted a brief pursuant to <u>Anders v. California</u>, 386 U.S. 738 (1967). Thereafter, in keeping with the procedure outlined in <u>Anders</u>, Applicant submitted a *pro se* brief. The appellate court then undertakes a full examination of the entire record. "The purpose of filing a brief under <u>Anders</u> is to ensure the *merits* of the appeal are not overlooked. The court has to conclude independently, regardless of counsel's conclusion, whether or not the appeal has merit before it can dismiss the appeal." <u>State v. McKennedy</u>, 348 S.C. 270, 279, 559 S.E.2d 850, 855 (2002). Given this review, Applicant's claim that meritorious issues were overlooked must fail.

### Other Allegations

No other allegations were raised at the PCR hearing. Therefore, any additional allegations are deemed waived because no evidence was presented.

### CONCLUSION

Based on all the foregoing, this Court finds and concludes that the Applicant has not established any constitutional violations or deprivations that would require this court to grant his application. Therefore, this application for post conviction relief must be denied and dismissed with prejudice.

This Court advised Applicant that he must file a notice of intent to appeal within thirty (30) days from the receipt of this Order to secure the appropriate appellate review. His attention is also directed to South Carolina Appellate Court Rule 227 for appropriate procedures after notice has been timely filed.

IT IS THEREFORE ORDERED:

1. That the Application for Post-Conviction Relief must be DENIED AND DISMISSED WITH PREJUDICE; and

2. The Applicant must be remanded to the custody of the Respondent; and
3. Applicant's three kidnapping convictions should be REMANDED to the Court of General Sessions SOLELY FOR THE PURPOSE OF ALLOWING A FINDING TO BE MADE ON THE RECORD AS TO WHETHER OR NOT THE KIDNAPPINGS WERE SEXUAL IN NATURE.

App. 748-67. On December 16, 2010, PCR Counsel filed a Motion for Rehearing, or alternatively a Motion to Alter or Amend, App. 769-73, and the State filed a Return to Petitioner's Motion on December 23, 2010, App. 774-76. On January 5, 2011, the PCR court denied Petitioner's Motion. App. 780-81. Appellate Defender Breen Richard Stevens filed a Petition for Certiorari on Petitioner's behalf. ECF No. 24-8. Therein, Petitioner presented the following issues for review:

I.    Counsel was ineffective for failing to subpoena any witness to support his defense theory when Counsel acknowledged calling witnesses was critical to establishing the defense.
II.   Counsel was ineffective for failing to perform a reasonable independent investigation for patrons of the night club, thereby failing to find Sammy Wells before trial, whose testimony would have established the theory of self-defense.

*Id.* at 3. Assistant Attorney General Mary S. Williams filed a Return on behalf of the State. ECF No. 24-9. After the case was transferred, the South Carolina Court of Appeals denied the petition, and issued the Remittitur on September 22, 2014. ECF Nos. 24-10, 24-11. This federal habeas Petition followed and was filed on April 10, 2014. ECF No. 1.

III.   Discussion

A. Federal Habeas Issues

Petitioner raises the following issues in his federal Petition for a Writ of Habeas Corpus, quoted verbatim:

GROUND ONE: The trial court erred in refusing to grant a mistrial where manifest necessity was clearly demonstrated.
Supporting Facts: Decedent's mother had an emotional outburst during presentation of the State's case utilizing graphic evidence and had to be assisted

out of the courtroom and one juror was emotionally and visibly moved by the evidence and resulting outburst. ECF No. 1 at 5.

GROUND TWO: The trial court erred in finding Petitioner could be impeached by a "similar" prior conviction outside the scope of prior bad act procedures, without conducting a probative v. prejudicial effect analysis, if Petitioner elected to testify.

Supporting Facts: The trial court failed to conduct an analysis of the probative vs. prejudicial effect of the introduction of a similar prior conviction in the instant matter if Petitioner elected to testify and Petitioner was thus deterred from exercising his constitutional right to testify in his own defense. *Id.* at 6-7.

GROUND THREE: The trial court erred in denying the motion for continuance which denied Petitioner the right to effective assistance of counsel.

Supporting Facts:  The court's denial of the motion for continuance interfered with Petitioner's right to counsel's ability to prepare an adequate defense and submit the State's case to adversarial testing and failing to place the grounds for denial on the record to preserve the matter for appellate review. *Id.* at 8.

GROUND FOUR: Petitioner was denied effective assistance of counsel when counsel failed to subpoena witnesses to support the trial theory of self-defense.

Supporting Facts: Petitioner was denied effective assistance of counsel and compulsory process to obtain favorable witnesses when counsel failed to subpoena exculpatory witnesses to support a trial theory of self-defense and during PCR, trial counsel testified that calling witnesses was critical to the defense. *Id.* at 9-10.

GROUND FIVE:  Petitioner was denied effective assistance of counsel in failing to conduct a reasonable investigation of witnesses which deprived Petitioner of a witness to substantiate a trial theory of self-defense.

Supporting Facts:   Petitioner was denied effective assistance of counsel, compulsory process, and the right to present a defense when trial counsel failed to conduct an adequate investigation to locate and subpoena Sammy Wells to testify that Petitioner acted in self defense. *Id.* at 12.

B.  Standard for Summary Judgment

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial.  *See Celotex Corp. v. Catrett*, 477

U.S. 317, 322-23 (1986).  If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248. Further, while the federal court is charged with liberally construing a complaint filed by a pro se litigant to allow the development of a potentially meritorious case, *see, e.g., Cruz v. Beto*, 405 U.S. 319 (1972), the requirement of liberal construction does not mean that the court can ignore a clear failure in the pleadings to allege facts that set forth a federal claim, nor can the court assume the existence of a genuine issue of material fact when none exists. *Weller v. Dep't of Soc. Servs.*, 901 F.2d 387 (4th Cir. 1990).

C.  Habeas Corpus Standard of Review

1.    Generally

Because Petitioner filed his Petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), review of his claims is governed by 28 U.S.C. § 2254(d), as amended. *Lindh v. Murphy*, 521 U.S. 320 (1997); *Breard v. Pruett*, 134 F.3d 615 (4th Cir. 1998). Under the AEDPA, federal courts may not grant habeas corpus relief unless the

underlying state adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. 28 U.S.C. § 2254(d)(1)(2); *see Williams v. Taylor*, 529 U.S. 362, 397-98 (2000). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 410.

### a.   Deference to State Court Decisions

Courts afford deference to state courts' resolutions of the habeas claims of state prisoners. *See Bell v. Cone*, 543 U.S. 447, 455 (2005). The Supreme Court has provided further guidance regarding the deference due to state-court decisions. *Harrington v. Richter*, 562 U.S. 86 (2011); *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011). To obtain habeas relief from a federal court, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103. "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102. The Court further stated: "If this standard is difficult to meet, that is because it was meant to be." *Id.*; *see Richardson v. Branker*, 668 F.3d 128, 137-44 (4th Cir. 2012) (quoting *Harrington* extensively and reversing district court's grant of writ based on his ineffective assistance of counsel claims).

In interpreting § 2254(d)(1) and discussing the federal courts' role in reviewing legal determinations made by state courts, the United States Supreme Court held as follows:

> [A] federal court may grant a writ of habeas corpus if the relevant state-court decision was either (1) "contrary to . . . [clearly] established Federal law as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States.

*Williams v. Taylor*, 529 U.S. 362, 404-05 (2000) (quoting from § 2254(d)(1)). "Clearly established Federal law in § 2254(d)(1) refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Carey v. Musladin*, 549 U.S. 70, 74 (2006) (quoting *Williams*, 529 U.S. at 412). In considering whether a state-court decision is "contrary to" clearly established federal law, the federal court may not grant relief unless the state court arrived at a conclusion opposite to that reached by the Supreme Court on a legal question, the state court decided the case differently than the Court has on facts that are materially indistinguishable, or if the state court "identifie[d] the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applie[d] that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 405-13. The "unreasonable application" portion of § 2254(d)(1) "requires the state court decision to be more than incorrect or erroneous[,]" it "must be objectively unreasonable," which is a higher threshold. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (internal citation omitted).

Section 2254(e)(1) requires the federal court give a presumption of correctness to state-court factual determinations and provides that a petitioner can only rebut such a presumption by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Accordingly, a habeas petitioner is entitled to relief under § 2254(d)(2), only if he can prove, by clear and convincing evidence, that the state court unreasonably determined the facts in light of the evidence presented in state court.

b.  Ineffective Assistance of Counsel

The Sixth Amendment provides a criminal defendant the right to effective assistance of counsel in a criminal trial and first appeal of right. In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court announced a two-part test for adjudicating ineffective assistance of counsel claims. First, a petitioner must show that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. *Id.* at 687. Second, the petitioner must show that this deficiency prejudiced the defense. *Id.* at 694. The United States Supreme Court's 2011 decisions cited previously elaborate on the interplay between *Strickland* and § 2254, noting the standards are "both highly deferential," and "when the two apply in tandem, review is doubly so." *Harrington*, 562 U.S. at 105 (internal quotation marks omitted); *Pinholster*, 131 S. Ct. at 1403.

Further, in *Pinholster*, the Court held for the first time that the federal court's habeas review under § 2254(d)(1) is limited to the record before the state court that adjudicated the claim on the merits. 131 S. Ct. at 1398. The Court explained that "review under § 2254(d)(1) focuses on what a state court knew and did." *Id.* at 1399. In the *Pinholster* case, the district court had conducted an evidentiary hearing and considered new evidence in connection with its review and granting of the petitioner's writ based on a finding of ineffective assistance of counsel. *Id.* at 1397. In an en banc decision, the Ninth Circuit Court of Appeals affirmed the district court's grant of the writ. *Id.* The United States Supreme Court granted certiorari and reversed the Ninth Circuit, finding that the district court should not have considered additional evidence that had not been available to the state courts. 131 S. Ct. at 1398. Because the federal habeas scheme "leaves primary responsibility with the state courts," and "requires that prisoners ordinarily must exhaust state remedies," the Court held that to permit new evidence to be presented in a federal habeas

court "would be contrary to that purpose." 131 S. Ct. at 1399 (internal citation and quotation marks omitted).

When a petitioner raises in a § 2254 habeas petition an ineffective-assistance-of-counsel claim that was denied on the merits by a state court, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable[,]" not "whether defense counsel's performance fell below *Strickland's* standard." *Harrington*, 562 U.S. at 101. "For purposes of § 2254(d)(1), 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" *Id.* (citing *Williams*, 529 U.S. at 410) (emphasis in original). "A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Id.*

### 2.    Procedural Bar

Federal law establishes this court's jurisdiction over habeas corpus petitions. 28 U.S.C. § 2254. This statute permits relief when a person "is in custody in violation of the Constitution or laws or treaties of the United States[,]" and requires that a petitioner present his claim to the state's highest court with authority to decide the issue before the federal court will consider the claim. 28 U.S.C. § 2254(a)-(b). The separate but related theories of exhaustion and procedural bypass operate in a similar manner to require that a habeas petitioner first submit his claims for relief to the state courts. A habeas corpus petition filed in this court before the petitioner has appropriately exhausted available state-court remedies or has otherwise bypassed seeking relief in the state courts will be dismissed absent unusual circumstances detailed below.

### a.    Exhaustion

Section 2254 contains the requirement of exhausting state-court remedies and provides as follows:

(b)     (1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court, shall not be granted unless it appears that—

    (A)     the applicant has exhausted the remedies available in the courts of the State; or

    (B)     (i) there is an absence of available State corrective process; or

        (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

    (2) An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.

    (3) A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement.

(c)     An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

The statute requires that, before seeking habeas corpus relief, the petitioner first must exhaust his state court remedies. 28 U.S.C. § 2254(b)(1)(A). "To satisfy the exhaustion requirement, a habeas petitioner must present his claims to the state's highest court." *Matthews v. Evatt*, 105 F.3d 907, 911 (4th Cir. 1997) *overruled on other grounds by U.S. v. Barnette*, 644 F.3d 192 (4th Cir. 2011). Thus, a federal court may consider only those issues that have been properly presented to the highest state courts with jurisdiction to decide them.

In South Carolina, a person in custody has two primary means of attacking the validity of his conviction: (1) through a direct appeal; or (2) by filing an application for PCR. State law requires that all grounds be stated in the direct appeal or PCR application. Rule 203, SCACR; S.C. Code Ann. § 17-27-10, *et seq.*; S.C. Code Ann. § 17-27-90; *Blakeley v. Rabon*, 221 S.E.2d 767, 770 (S.C. 1976). If the PCR court fails to address a claim as is required by section 17-27-80

of the South Carolina Code, counsel for the applicant must make a motion to alter or amend the judgment pursuant to Rule 59(e), SCRCP. Failure to do so will result in the application of a procedural bar by the South Carolina Supreme Court. *Marlar v. State*, 653 S.E.2d 266, 267 (S.C. 2007). Strict time deadlines govern direct appeals and the filing of a PCR in the South Carolina courts. A PCR must be filed within one year of judgment, or if there is an appeal, within one year of the appellate court decision. S.C. Code Ann. § 17-27-45.

Furthermore, in filing a petition for habeas relief in the federal court, a petitioner may present only those issues that were presented to the South Carolina Supreme Court or the South Carolina Court of Appeals. *See State v. McKennedy*, 559 S.E.2d 850, 853 (S.C. 2002) (holding "that in all appeals from criminal convictions or post-conviction relief matters, a litigant shall not be required to petition for rehearing and certiorari following an adverse decision of the Court of Appeals in order to be deemed to have exhausted all available state remedies respecting a claim of error") (quoting *In re Exhaustion of State Remedies in Criminal and Post-Conviction Relief Cases*, 471 S.E.2d 454, 454 (S.C. 1990)).

b.     Procedural Bypass

Procedural bypass, sometimes referred to as procedural bar or procedural default, is the doctrine applied when a petitioner who seeks habeas corpus relief as to an issue failed to raise that issue at the appropriate time in state court and has no further means of bringing that issue before the state courts. In such a situation, the person has bypassed his state remedies and, as such, is procedurally barred from raising the issue in his federal habeas petition. Procedural bypass of a constitutional claim in earlier state proceedings forecloses consideration by the federal courts. *See Smith v. Murray*, 477 U.S. 527, 533 (1986). Bypass can occur at any level of

the state proceedings if the state has procedural rules that bar its courts from considering claims not raised in a timely fashion.

The South Carolina Supreme Court will refuse to consider claims raised in a second appeal that could have been raised at an earlier time. Further, if a prisoner has failed to file a direct appeal or a PCR and the deadlines for filing have passed, he is barred from proceeding in state court. If the state courts have applied a procedural bar to a claim because of an earlier default in the state courts, the federal court honors that bar. As the United States Supreme Court explains:

> [state procedural rules promote] not only the accuracy and efficiency of judicial decisions, but also the finality of those decisions, by forcing the defendant to litigate all of his claims together, as quickly after trial as the docket will allow, and while the attention of the appellate court is focused on his case.

*Reed v. Ross*, 468 U.S. 1, 10-11 (1984).

However, if a federal habeas petitioner can show both (1) "'cause' for noncompliance with the state rule[,]" and (2) "'actual prejudice resulting from the alleged constitutional violation[,]'" the federal court may consider the claim. *Smith v. Murray*, 477 U.S. at 533 (quoting *Wainwright v. Sykes*, 433 U.S. 72, 84 (1977)). When a petitioner has failed to comply with state procedural requirements and cannot make the required showing of cause and prejudice, the federal courts generally decline to hear the claim. *Murray v. Carrier*, 477 U.S. 478, 496 (1986).

If a federal habeas petitioner has failed to raise a claim in state court and is precluded by state rules from returning to state court to raise the issue, he has procedurally bypassed his opportunity for relief in the state courts and in federal court. A federal court is barred from considering the filed claim (absent a showing of cause and actual prejudice). In such an instance, the exhaustion requirement is technically met and the rules of procedural bar apply. *See Teague*

25

*v. Lane*, 489 U.S. 288, 297-98 (1989); *Matthews*, 105 F.3d at 915 (citing *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991); *George v. Angelone*, 100 F.3d 353, 363 (4th Cir. 1996)).

### 3.    Cause and Actual Prejudice

Because the requirement of exhaustion is not jurisdictional, this court may consider claims that have not been presented to the South Carolina Supreme Court in limited circumstances in which a petitioner shows sufficient cause for failure to raise the claim and actual prejudice resulting from the failure, *Coleman*, 501 U.S. at 750, or that a "fundamental miscarriage of justice" has occurred. *Murray v. Carrier*, 477 U.S. at 495–96. A petitioner may prove cause if he can demonstrate ineffective assistance of counsel relating to the default, show an external factor that hindered compliance with the state procedural rule, or demonstrate the novelty of a particular claim. *Id.* Absent a showing of cause, the court is not required to consider actual prejudice.  *Turner v. Jabe*, 58 F.3d 924, 931 (4th Cir. 1995). However, if a petitioner demonstrates sufficient cause, he must also show actual prejudice in order to excuse a default. *Murray v. Carrier*, 477 U.S. at 492. To show actual prejudice, the petitioner must demonstrate more than plain error.

## IV.    Analysis

### A.  Procedurally Barred Grounds

As an initial matter, Respondent maintains that Petitioner's first, second, third, and a portion of his fourth arguments are procedurally barred from habeas review. ECF No. 24 at 29-34. The undersigned will address each procedural bar argument in turn.

### 1. Ground One

Respondent argues that Ground One is not cognizable on habeas review because it is a matter of state law. *Id.* at 29. In Response, Petitioner argues that Ground One was properly

presented to the trial court and ruled upon. ECF No. 38 at 22. Further, Petitioner maintains that Ground One was "presented face up and squarely in counsel's *Anders* Brief to the South Carolina Court of Appeals." *Id.* Petitioner also maintains the mistrial issue is "manifestly necessary" and "a mistrial denial has Fifth and Sixth Amendment Constitutional implications." *Id.*

As indicated in the background section of this Report, Ground One—whether the trial court erred in failing to grant Petitioner's motion for a mistrial—was raised to and ruled upon by the trial court and thereafter was raised in appellate counsel's *Anders* brief to the South Carolina Court of Appeals. App. 502. Therefore, it is not procedurally barred from habeas review. However, as Respondent maintains, the undersigned finds that Ground One is not a cognizable habeas ground even though Petitioner asserts in his Response that Ground One presents potential due process implications or violations. In his habeas Petition Petitioner never alleged that he was deprived of a federal right such that he is entitled to federal habeas relief under 28 U.S.C. § 2254. *See e.g., Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (holding violations of state law and procedure that do not implicate specific federal constitutional provisions are not cognizable in habeas review); *Engle v. Isaac*, 456 U.S. 107, 119 (1982) (holding petitioner did not allege a deprivation of federal rights based his challenge to the correctness of the self-defense charge given during his trial). However, in the event the district court finds that Petitioner has alleged a federal rights violation and out of an abundance of caution, the undersigned will review the mistrial issue on the merits.

### 2. Ground Two

Respondent maintains that Ground Two is procedurally barred because there was no trial objection at the trial court level and thus, the issue was not preserved for appellate review. ECF

No. 24 at 29. Further, regarding Ground Two, Respondent argues it is also not a cognizable issue for habeas review because admission of evidence is a matter of state law. *Id.* at 30. Finally, Respondent contends that Ground Two is procedurally barred because Petitioner did not testify during his trial. *Id.* at 31.

With regards to Ground Two, Petitioner concedes that there was no trial objection, but argues "[t]hese submissions clearly indicate the ineffective assistance of post-conviction counsel for failing to properly amend the PCR application as required." ECF No. 38. Further, Petitioner argues that *Martinez v. Ryan*, 566 U.S. 1 (2012), can excuse the procedural default, and "[t]he record here succinctly and clearly demonstrates that trial counsel failed to enter appropriate objections, proffer or stipulation, thus depriving Petitioner of the right to testify and appellate review of the claim." *Id.*

In Ground Two, Petitioner maintains that the "trial court erred in finding Petitioner could be impeached by a 'similar' prior conviction outside the scope of prior bad act procedures, without conducting a probative v. prejudicial effect analysis, if Petitioner elected to testify." ECF No. 1 at 6-7. Though this issue was raised during trial and thereafter was raised in Petitioner's pro se response to the *Anders* brief, this issue was not preserved for appellate review because Petitioner did not testify at trial. In South Carolina, for an evidentiary issue to be preserved for appellate review, there must be a contemporaneous objection made when the evidence, such as testimony, is sought to be introduced. *State v. Glenn*, 330 S.E.2d 285 (S.C. 1985) (holding defendant failed to preserve for review the question of improper impeachment where trial judge ruled that defendant's prior prostitution convictions could be used for impeachment purposes and defendant elected not to testify); *State v. Hoffman*, 440 S.E.2d 869, 873 (S.C. 1994) ("A contemporaneous objection is required to properly preserve an error for appellate review.").

Here, because Petitioner did not testify there was no contemporaneous objection. Therefore, this issue was not preserved for appellate review, and is procedurally barred from habeas review. *See e.g.*, *Satterfield v. Zahradnick*, 572 F.2d 443, 446 (4th Cir. 1978) ("Errors at trial not objected to, in contravention of State contemporaneous objection rules, are not cognizable in federal habeas corpus proceedings, absent a showing of cause for non-compliance and prejudice."); *McKenzie v. Cartledge*, No. 8:13-CV-02488-RBH, 2014 WL 3919711, at *2 (D.S.C. Aug. 11, 2014) *appeal dismissed*, 595 F. App'x 240 (4th Cir. 2015) (finding a procedural bar where "Petitioner raised the issue on direct appeal to the South Carolina Court of Appeals, [and] the appellate court found that the issue was unpreserved for direct review. Indeed, South Carolina appellate courts require that issues be adequately raised to and ruled upon by a trial court for appellate review for error.").

The undersigned is not persuaded by Petitioner's argument that *Martinez* should excuse any default that occurred. Here, Petitioner is arguing trial court error occurred concerning certain prior bad act evidence. However, the *Martinez* case holds that procedural default based on PCR counsel error will be excused in certain instances, 132 S.Ct. 1309 (2012), and does not stand for the proposition that allegations of trial court error that were procedurally defaulted in state court may be excused and addressed on the merits. In certain instances, *Martinez* can be used to excuse default for a ground PCR counsel failed to raise concerning *trial counsel error*. Here, Petitioner is arguing trial court error. Therefore, *Martinez* cannot serve to excuse the procedural default of Ground Two. Accordingly, the undersigned recommends granting Respondent's Motion for Summary Judgment on Ground Two.

Concerning Ground Two, Petitioner may, nonetheless, overcome procedural defaults and have his claims addressed on the merits, by showing either cause and prejudice for the default, or

that a miscarriage of justice would result from the lack of such review. *See Coleman*, 501 U.S. at 750; *Savino v. Murray*, 82 F.3d 593, 602-03 (4th Cir. 1996). The existence of cause ordinarily turns upon a showing of: 1) a denial of effective assistance of counsel, 2) a factor external to the defense which impeded compliance with the state procedural rule, or 3) the novelty of the claim. *Murray*, 477 U.S. at 488.    Having reviewed the record, evidence, and the parties' legal memoranda, the undersigned finds that Petitioner has not shown sufficient cause and prejudice to excuse the default of Ground Two. Thus, Ground Two is procedurally barred from consideration by this court and should be dismissed. *Mazzell v. Evatt*, 88 F.3d 263, 269 (4th Cir. 1996) (finding in order to show prejudice a Petitioner must show that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different); *Rodriguez v. Young*, 906 F.2d 1153, 1159 (7th Cir. 1990) ("Neither cause without prejudice nor prejudice without cause gets a defaulted claim into federal court.").

In order to demonstrate a miscarriage of justice, Petitioner must show he is actually innocent. Actual innocence is defined as factual innocence, not legal innocence. *Bousley v. United States*, 523 U.S. 614, 623 (1998). Petitioner cannot establish that the errors he complains of probably resulted in the conviction of an innocent person. *Schlup v. Delo*, 513 U.S. 298, 327 (1995). In order to pass through the actual-innocence gateway, a petitioner's case must be "truly extraordinary." *Id.* (internal citation omitted). The court's review of the record does not support a showing of any cause and prejudice or actual innocence to excuse the default. Thus, Ground Two is procedurally barred from consideration by this court and should be dismissed. The

undersigned therefore recommends that the Respondent's Motion for Summary Judgment be granted as to Ground Two.[3]

### 3. Ground Three

Respondent argues that Ground Three does not raise a cognizable federal habeas claim and was not raised at the trial court level. ECF No. 24 at 32. Thus, Respondent maintains that Ground Three is barred from review because South Carolina is an issue preservation state. *Id.* Additionally, Respondent argues that "Petitioner is barred from an evidentiary hearing on this ground because he failed to establish an evidentiary basis for this claim in state court proceedings, [and] [t]his was a direct appeal issue." *Id.* at 33.

Petitioner argues that Ground Three was "properly raised to and ruled upon by the trial court [and] presented to the highest state court on direct appeal, in the *pro se Anders* brief." ECF No. 38 at 25. Additionally, Petitioner maintains that "the claim of denial of a continuance by the trial court, encompasses the Sixth Amendment rights to the effective assistance of counsel and the right to prepare and present a defense to the State's indictments." *Id.*

As indicated in the background section of this Report, Ground Three—whether the trial court erred in failing to grant Petitioner's motion for a continuance—was raised to and ruled upon by the trial court and thereafter was raised in Petitioner's pro se Response to the *Anders* brief. App. 509. Therefore, it is not procedurally barred from habeas review. However, the essence of Petitioner's argument concerns the thoroughness of trial counsel's trial preparation which would present certain constitutional trial rights issues. In this Report, the undersigned addresses the effectiveness of trial counsel in the merits section, including the thoroughness of

---

[3] The Fourth Circuit has stated that once a claim is determined to be procedurally barred, the court should not consider the issue on its merits. *Kornahrens v. Evatt*, 66 F.3d 1350 (4th Cir. 1995). Accordingly, the undersigned will not discuss the merits of Ground Two.

his investigation. Accordingly, the undersigned will effectively review Ground Three when considering the merits of Grounds Four and Five.

### 4. Ground Four

Concerning Ground Four, Respondent argues that "on appeal from the denial of PCR, Petitioner only raised the failure to investigate, discover, and call Ricky Wright and Terrance Epperson." ECF No. 24 at 34 (citations omitted). Consequently, Respondent maintains that "any other witnesses or evidence Petitioner is asserting on federal habeas corpus review that trial counsel should have investigated, discovered, or called [other than Wright or Epperson] are procedurally barred on federal habeas review because Petitioner failed to raise those issues to the South Carolina appellate courts." *Id.* Therefore, it is Respondent's position that a portion of Ground Four is procedurally barred from habeas review. *Id.* Petitioner does not respond to Respondent's procedural bar argument concerning witnesses other than Wright and Epperson.

Upon review of the Petition for Certiorari, *see* ECF No. 24-8, the undersigned finds that no part of Ground Four is procedurally barred from habeas review. In the Petition, Petitioner clearly argued that trial counsel was ineffective in failing to subpoena "any witness" to support his defense theory. *Id.* at 3. Therefore, the undersigned will address Ground Four, in its entirety, on the merits.

### B.  Merits Analysis-Grounds One, Four, and Five

#### 1.     Ground One:  Mistrial due to outburst

In Ground One, Petitioner alleges the trial court erred in failing to grant his motion for a mistrial after the victim's mother had an emotional outburst during the State's presentation of its case. ECF No. 1 at 5. Petitioner maintains that "one juror was emotionally and visibly moved by the evidence and resulting outburst." *Id.*

The outburst Petitioner references in Ground One occurred while the State was presenting evidence and questioning Investigator Michael Keith Rogers. App. 60-67. During Investigator Rogers' testimony, the State published photographs of the victim's wounds into evidence. App. 64. While the witness described the victim's wounds from the pictures, the record indicates that the "mother of the victim was helped from the courtroom." App. 65. Thereafter, the trial court excused the jury from the courtroom. *Id.*

Trial counsel argued that the victim's mother's crying continued throughout the courtroom into the hallway. App. 66. Further, trial counsel maintained that he "saw one of the jurors sink their head down and shake their head." *Id.* The following colloquy continued:

> Trial Counsel:  I don't know how my client can now get a fair trial in front of this jury. I mean that's the kind of emotional . . . I'm not talking, your Honor, it wasn't just confined to sniffles and crying. It was loud, very emotional. My client cannot get a fair trial jury trial in this courtroom because that jury's going to convict somebody. I mean when that woman left this room wailing like she did, their only thoughts now are going to be . . .
>
> The Court: I understand that she was highly, she was highly emotional. This is an emotional thing, but at the same time, how do you equate that emotion to any conduct on the part of your client?
>
> . . . .
>
> Trial Counsel: . . . The jurors, it had an effect on the jurors, and if that hasn't, something that doesn't come from the witness stand, that comes from the audience or someone in the presence in the courtroom, it has an effect on the jury that is so prejudiced that their ability to make a decision that's fair to my client, that, your Honor, is a reason for a mistrial.

App. 66-67. The trial court offered to give the jury instruction, but trial counsel responded that he did not think the outburst could be cured. App. 67. Thereafter, trial counsel agreed that the trial court give the jury a "curity of instruction" but argued again for a mistrial. App. 68. Alternatively, the trial court offered to conduct "an inquiry of the jury as to whether the outburst would prevent them from giving to both the State and the Defendant a fair and impartial trial based on the evidence and not based on upon the emotion." *Id.* Ultimately, the trial court decided

to give a curative instruction rather than questioning the jurors individually and denied Petitioner's motion for a mistrial. App. 70-72.

The trial court then brought the jury back into the courtroom and gave the following curative instruction:

> Whenever you have a case involving a death, it is obvious it is emotional, an emotional situation for all of the parties that are involved, with the families involving both sides of this case, and I want to tell you that it will be your duty to decide this case based upon the evidence that is presented in this courtroom and not on the basis of any emotion or sympathy. Again, I'm going to tell you that several times throughout the trial of this case and especially in the end, but you are to decide this case based upon evidence that you hear from this witness stand and from any evidence that has been introduced into evidence. You would exclude from your mind, and I will tell you that you cannot decide this case based upon emotion or sympathy, and that you have no friends to reward or enemies to punish. Our job is to decide this case based upon the truth as the finder of facts based upon the truth. I will tell you now that if there is anyone on the jury that feels they cannot follow the instructions of the court and decide this case based upon the law and the evidence as opposed to emotion or sympathy, I would need to know about it now. In other words, if anybody thinks that they cannot decide this case based upon the evidence that is presented and would be swayed by emotion and sympathy, then I would need to know about it now.

App. 71-72. The record indicates that no juror responded. App. 72. Thereafter, the trial court instructed the State to proceed with its case and resume questioning of Investigator Rogers. *Id.*

South Carolina courts review the grant or denial of a motion for mistrial under an abuse of discretion standard. *See State v. Washington*, 432 S.E.2d 448 (S.C. 1992). The burden is on the moving party to show error in denying the mistrial and resulting prejudice. *State v. Tuckness*, 185 S.E.2d 607 (S.C. 1971). The undersigned has reviewed the record and finds Petitioner has failed to demonstrate he suffered any prejudice by the trial court's denial of his motion for mistrial, especially in light in of the curative instruction given. Furthermore, the undersigned finds that Petitioner has failed to demonstrate that he was denied any constitutional rights or that the trial court's decision and ultimately the South Carolina Court of Appeal's decision was

contrary to or involved an unreasonable application of clearly established federal law. As a result, the undersigned finds that Ground One is without merit and should be dismissed.

> 2.      Grounds Four and Five:   Ineffective Assistance of Counsel/Inadequate Investigation

In his Fourth Ground, Petitioner contends that he was denied effective assistance of trial counsel because trial counsel failed to subpoena witnesses to support the trial theory of self-defense. ECF No. 1 at 9. In his Fifth Ground, Petitioner argues that he was denied effective assistance of counsel because his trial counsel did not locate and subpoena Sammy Wells to testify as a witness. *Id.* at 12.[4] Though the argument portion of his petition for certiorari to the South Carolina Supreme Court mainly concerns trial counsel's failure to call Ricky Wright and Terrance Epperson as witnesses, the undersigned finds that Petitioner argued on PCR appeal that trial counsel failed to call "any witnesses" to support his defense. ECF No. 24-8. Therefore, the undersigned will review the proffered testimony from the three witnesses who did not testify during Petitioner's criminal trial. During Petitioner's PCR hearing, PCR counsel entered 12 witness statements into evidence. App. 595-96; 810-886. Of the 12 witnesses who gave statements, only Terrance Epperson was not called as a witness during Petitioner's criminal trial. Therefore, in addition to reviewing the PCR witnesses' testimony, the undersigned also reviewed Epperson's statement in determining the merits of Ground Four.

---

[4] In Ground Three, Petitioner maintains that his trial counsel was unable to adequately prepare for trial because the trial court denied his Motion for a Continuance. However, there is no evidence that the trial court's failure to grant a continuance affected trial counsel's ability to effectively represent Petitioner. During Petitioner's criminal trial, trial counsel stated that witnesses were not willing to come forward so that Petitioner could tell his side of the story. App. 488-89. Furthermore, as will be indicated in this section, the content of the witnesses' testimony during Petitioner's PCR hearing was either immaterial or would not have affected the outcome of Petitioner's criminal trial. Accordingly, the undersigned recommends that Respondent be granted Summary Judgment on Ground Three and that Ground Three be dismissed.

The Sixth Amendment to the United States Constitution guarantees a defendant the right to effective assistance of counsel in a criminal prosecution. *McMann v. Richardson*, 397 U.S. 759, 771 (1970). In *Strickland v. Washington* the Supreme Court held that to establish ineffective assistance of counsel, a petitioner must show deficient performance and resulting prejudice. 466 U.S. at 687. Counsel renders ineffective assistance when his performance "[falls] below an objective standard of reasonableness," but there is a "strong presumption" that counsel's performance was professionally reasonable. *Id.* at 688-89. Prejudice requires a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

During his PCR hearing, Petitioner called three witnesses to testify on his behalf. First, Petitioner called Dorothy Perry as a witness. App. 549. Perry testified that she recalled giving a statement to police, and PCR counsel entered the statement into evidence. App. 550. Though she was called as a witness during Petitioner's criminal trial, Perry testified that she failed to appear because she was scared. App. 550-51. Perry testified that her husband owned the nightclub where the shooting occurred and that they worked there together. App. 551. Other than general knowledge about operating the club, Perry offered nothing specific to aid Petitioner's trial defense during her PCR testimony. The undersigned also reviewed Perry's witness statement that was introduced into evidence during the PCR hearing. App. 823. Perry's witness statement placed Petitioner at the club on the night of the shooting. *Id.* Additionally, in her statement, Perry indicated that she saw Petitioner with a gun in his hand after she heard several gunshots. *Id.* Further, Perry's statement indicates that Petitioner left the nightclub in a car with three other males. *Id.*

36

Ricky Lee Wright also testified during Petitioner's PCR hearing. App. 555. Wright testified that he was at the nightclub on the night of the shooting and that he knew Petitioner. App. 556. Further, Wright testified that he saw Petitioner at the nightclub and spoke to him. App. 557. Wright testified that he did not see Petitioner carrying a gun when Petitioner exited the club. App. 558. Additionally, Wright testified that he did not see Petitioner attempt to carjack or cause any violence to the people that he got into the car with. *Id.* Though Wright did not speak to law enforcement after the shooting, he testified that he spoke with Petitioner's trial counsel prior to Petitioner's criminal case. App. 559. However, Wright testified that he did not receive a subpoena to appear as a witness during Petitioner's 2004 trial. App. 559-60.

Sammy Wells was also called as a witness during Petitioner's PCR hearing. App. 563. Wells testified that he was at the club on the night of the shooting and saw the victim holding a gun and saw "fire pop from it," and "heard random gunshots." App. 563-64. Wells testified that he knew the victim from their neighborhood and knew he carried a gun. App. 565. Wells testified that neither law enforcement nor Petitioner's trial counsel approached him to discuss Petitioner's case. App. 567. At the conclusion of direct examination, Wells testified that he saw no one else carrying a gun inside the club on the night of the shooting. App. 568. Wells testified that he saw a man named "Ricky" with a gun that night, but Wells "didn't see him in the club that night." *Id.* On cross-examination, Wells testified that he did not know Petitioner and did not see Petitioner on the night of the shooting. App. 569-70.

As noted above, during Petitioner's PCR hearing, PCR counsel introduced several witness statements into evidence. Terrance Epperson, the only witness who was not called during Petitioner's trial, gave the following statement to police:

> On Friday, September 20, 2002 I came from North Carolina with my girlfriend, Natasha McKnight. We got to my house around 9:30 p.m. Approx. 15 minutes

37

later Stacey Pringle came to my house [REDACTED]. I told Natasha to contact me on Sunday when she was ready to leave. Natasha pulled off. She was going to visit her family and was going to pick me up on Sunday. Stacey and I then talked for about two minutes. We left my house and went to Stacey's house [REDACTED]. We stayed there and drank a beer or two. We then got into Stacey's truck and went to Teresa Rhodes' house across from Andres' Plaza. We both went in and spoke. Then we walked across the street to Andres' Plaza. Stacey and I went inside and drank some beers. I talked to Donzo Bailey, a different Stacey and two other individuals that I knew by face. After that Stacey and I left and went to Players. We had a couple of drinks there. I ate some hot wings. I'm not sure how long we stayed, but once we left there we went to KJ's. Stacey drove us to KJ's and he parked his black Honda Passport truck in the Shrimper's parking lot. I stayed in the truck and finished the beer that I was drinking while Stacey got out and went around to the front of the building (KJ's). Stacey went into KJ's just before me. Once we were inside, I talked to Stacey for a minute. Then we split up. I began mingling with some people that I knew. I spoke to Donzo Bailey again. I danced with Alicia Rhodes for about two or three songs. Then I went and bought another beer. I stopped and talked to a guy by the name of Larry that I knew. I then observed Stacey and Kenny Harris go out the back door of the club. A few minutes later I walked out back. Stacey had come back into the club. While I was outside I looked around and I saw Kenny. Kenny walked by me and nodded his head. I stood outside for about two minutes longer and then I walked back in. I continued to mingle. I was in between the dance floor and the bar and Stacey came up to me and told me that he thought that Kenny was trying to get his home boys to hate on him (meaning to start something). I told Stacey to chill out and have some fun. I didn't take it serious, because I thought that Stacey was just intoxicated. I then started dancing with Alicia again. Alicia's cousin (a black male) then came up and started dancing with us. Stacey came up to me again and said that he thought that Kenny might have had the boys out there hating on him. Stacey is kind of a paranoid person. I told Stacey again just to chill out. I continued dancing with Alicia. Alicia's cousin had left by this time. Shortly after that I heard two gunshots, back to back. I think that the gunshots came from behind me. Everybody started running out the club. As I was running towards the front door I heard about three more gunshots. I was thinking at the time that it was either Stacey or Kenny doing the shooting. On my way out the door I tripped over several people. When I got outside I ran across Broad Street and turned onto Carolina Ave. I ran down Carolina Ave. and turned onto Jackson Street. I ran all the way down Jackson Street and turned onto Woodlawn Ave. I then began to walk down Pear Street and my way to [REDACTED] [REDACTED].I sat on my side porch and smoked some cigarettes. I then dozed off. Between 6:30 a.m. and 7:00 a.m. I woke up and began walking. I tried to call Stacey a couple of times, but didn't get an answer on his cell phone. I ended up at the park across from Riley Ball Park. I called my sister (Crissey Epperson) on my cell phone and asked her if my step-dad still wanted to get the meat for the cookout. My sister then came and picked me up. We went back to my house. I got the meat for my step-dad (George Damon) and took it to his house on Dogwood.  Then my sister

dropped me off at Lafayette Villa. I was going to see Anthony Scarborough. I knocked on the door, but I didn't get an answer. Then I walked straight down Lafayette down the old railroad tracks. I went to the Youngs store and I bought a soda. It was now between 9:00 a.m. and 10:00 a.m. Then I walked to Crosswell Park. I called my friend (Mike Mike) at his house in Fayetteville, N.C. I think his name is Michael Moore. I told him that I was at a club last night and some shooting had went on and that I was nervous and wanted him to come and pick me up. I told him what exit to take and told him to call me once he got there. I sat Crosswell Park for about an hour drinking my soda and smoking a cigarette. Then I began to walk home. The reason I didn't stay at home was because I thought the boys from the South Side or someone would try to come and start some trouble because they knew that Stacey and I are friends and were at the club together. I got home and packed my clothes. My friend got there about 20 minutes after I arrived home. He took me back to Fayetteville, N.C. Natasha called me on Sunday. She told me that she heard that Stacey had killed somebody at the club and that Stacey and I were arguing with a guy. I told her that we were not arguing and that I didn't know whether Stacey shot the guy or not.

Since the shooting I have not heard anything from Stacey. I have also not heard where Stacey is staying at. I did not drive Stacey's truck to the club and I did not drive Stacey's truck from the club. I never saw Stacey with a gun that night. I have never seen Stacey with a gun before or talk about a gun.

App. 885-86. Epperson signed the statement to police on September 25, 2002. App. 886.

With the exception of Wells' testimony, no PCR testimony or statement, including the statement from Epperson, weighs in Petitioner's favor or possibly supports a self-defense trial theory. As indicated in the PCR court's Order of Dismissal, neither law enforcement nor trial counsel was able to locate Wells after the shooting. App. 756. Based on trial counsel's efforts during his investigation, the PCR court found that trial counsel's failure to locate Wells was not unreasonable because "Wells was not at the scene when law enforcement arrived and no witness statement makes mention of Wells." *Id.* Further, no other witness mentioned Wells, and by his own admission, Wells "never told anyone at all about what he claimed to have seen prior to the PCR stage." *Id.* Therefore the PCR court found as a matter of law that trial counsel's investigation was not deficient. App. 756-57. Moreover, in light of the other "overwhelming" evidence presented during Petitioner's trial, the PCR court found that Wells' testimony would

not likely have affected the outcome of Petitioner's trial. App. 757. Finally, the PCR court found that Wells lacked credibility. *Id.*

The undersigned agrees with the PCR court's finding that trial counsel did not err in failing to locate and call Wells or others as witnesses. Furthermore, the undersigned has reviewed the trial transcript and agrees with the PCR court's finding that, based on the overwhelming evidence against Petitioner, no omitted testimony was likely to have had an effect on the outcome of Petitioner's criminal trial.

During his criminal trial, Margaret McDaniel testified as a State's witness and indicated that she was at the club on the night of the shooting and saw Petitioner there. App. 87-91. Further, she testified that she was standing about four feet away from the victim when Petitioner approached and fired twice at the victim. App. 92-93. McDaniel affirmed that she saw that Petitioner had a pistol in his hand. App. 93. McDaniel testified that she did not see the victim carrying a gun or knife. App. 94. Tammy McDaniel, Margaret McDaniel's sister, testified she was standing about three feet away from the victim when he was shot. App. 117. She specifically testified:  "I saw [Petitioner] with a gun. He's the only one I saw with a gun." *Id.* She also testified that the victim did not have a gun, and Petitioner fired twice. *Id.* After he fired shots, Tammy McDaniel testified that Petitioner pushed her down. App. 118. Mary Johnson testified that the victim was her cousin and she witnessed Petitioner approach and shoot the victim. App. 133-36. Specifically, Johnson testified that Petitioner "came up shooting." App. 137. Johnson testified that the gun was fired three or four times. *Id.* Further, she testified that she saw no one else with a gun other than Petitioner. App. 138. Selena McKnight also testified that she saw Petitioner shoot the victim and that she "didn't see nobody else with no gun in there." App. 147-50. Alicia Rhodes was also a State's witness and testified that she saw Petitioner shoot the

victim.  App. 198-207. Additionally, she testified that after Petitioner shot the victim, he pointed the gun at her and "pulled the trigger on the gun, but the gun did not go off." App. 201.

The undersigned finds Petitioner has failed to demonstrate either *Strickland* prong. First, as the PCR court found, it was not unreasonable for trial counsel to fail to call Wells as a witness. Further, the undersigned finds that no other PCR witness's testimony or Epperson's statement supports a self-defense theory. Moreover, based on five eye-witness statements—all indicating that Petitioner was the initial aggressor and shooter—the undersigned agrees that Petitioner was not prejudiced by any failure to call any PCR witness or Epperson. Thus, Petitioner failed to demonstrate that the result of his criminal trial would have been different but for counsel's alleged unprofessional errors under the second *Strickland* prong. Therefore, the undersigned finds that the PCR court's dismissal of Petitioner's claim of ineffective assistance of counsel was not an unreasonable application of federal law. Accordingly, the undersigned finds that Petitioner has failed to demonstrate that the state court's decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d) & (e)(1). As a result, the undersigned finds that Grounds Four and Five are without merit and should be dismissed.

V.      Conclusion and Recommendation

Wherefore, based upon the foregoing, the undersigned recommends that Respondent's

Motion for Summary Judgment, ECF No. 23, be GRANTED and the Petition be DENIED.

IT IS SO RECOMMENDED.

April 13, 2016                                    Kaymani D. West
Florence, South Carolina                         United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**